UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CAPITAL MACHINE COMPANY, INC., and IN- )
DIANA FORGE, LLC, )
     *Plaintiffs*, )
)    1:09-cv-00702-JMS-DML
     *vs*. )
)
MILLER VENEERS, INC., *et al.*, )
     *Defendants*. )

## ORDER

    Capital Machine Company, Inc. and Indiana Forge LLC (collectively, "Capital Ma-chine") have filed this patent-infringement action against Miller Veneers, Inc. and several indi-vidual defendants (collectively, "Miller Veneers"). Before the Court can consider the question of infringement, the Court must "determine[] the scope and meaning of the asserted patent claims." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1318 (Fed. Cir. 2011).[1] The Court will now do so with respect to the disputed claims in the six patents-in-suit: U.S. Pa-tent Nos. 5,562,137; 5,678,619; 5,694,995; 5,701,938; 5,819,828; and 7,395,843. For ease of reading, the Court will refer to the patents-in-suit by only their last three numbers going forward, for example, the '137 Patent instead of Patent No. 5,562,137.

---

[1] Federal Circuit precedent (to the extent not inconsistent with Supreme Court precedent) con-trols in this action. 28 U.S.C. § 1295(a).

# I.
## BACKGROUND

### A. Pre-Existing Technology [2]

The patents-in-suit represent attempts to improve the yields of veneer from tree trunks, which once "cut[]…down the middle along [their] longitudinal axis" become known in the industry as "flitches." [Dkt. 217-1 at 10, column 1.] For reasons of veneer quality, the industry slices the veneer from the outside, curved portion of the flitch, rather than along the flat longitudinal cut. [*See id.*] In the particular veneer-cutting method upon which these patents-in-suit build, devices known as "staylogs hold a flitch and move relative to a slicing knife. As the flitch passes the knife, the knife slices a sheet of veneer from the flitch." [*Id.*] Devices known as "dogs" keep the flitch on the staylog. "The dogs are clamping members that extend from the mounting surface of the staylog and are positioned on either side of flitch along the staylog. Typically, the dogs include a sharp-edged portion oriented parallel to the mounting surface to hold to cut into the flitch and hold it in place against the staylog." [*Id.*]

Existing mounting technology presented two problems that resulted in wasted veneer, problems that the patents-in-suit attempt to solve. The first problem is what the Court will call the "tapering" problem. "[B]ecause the tree trunk is naturally tapered, one end of the flitch is thicker than the other end, and consequently extends a greater distance from the mounting surface of the staylog. As a result, the veneer-producing zone of the flitch is frusto-conical…." [*Id.*] Until the slicing knife eliminates the taper, it creates so-called shim sheets of veneer that "are too narrow to be useful.... Consequently, some of the best veneer on a flitch is thrown away as waste." [*Id.*] The second problem that the patents-in-suit identified with existing technology

---

[2] Although the background that follows cites to the '137's description of the "background of the invention," the other patents have similar descriptions.

concerns the method of mounting the flitch to the staylog: The lengthwise groove in the flitch that the dogs grasp results in a loss of rigidity of the flitch toward the end of the slicing process, causing it to "flex in response to the pressure of the slicing knife resulting in, at best, nonuniform and unacceptable slices of veneer." [*Id.*] The Court will refer to that problem as the "flexing" problem.

**B.  The Relationship Among the Patents-in-Suit**

The patents-in-suit all ultimately derive from the applications that led to the '995 or '137 Patents.  The "children" patents represent continuations-in-part of those applications.  The patents-in-suit's "family tree" looks like this:



- 3 -

## C.  Claims to Be Construed[3]

Of the various claims in the patents-in-suit, only the following are in dispute:

| Patent | Claims for Construction | Disputed Phrases |
|---|---|---|
| '137 | 23. A method of retaining a flitch on a staylog for slicing veneer from the flitch, the staylog having a plurality of dogs, the method comprising the steps of: providing a flitch having a plurality of holes for receiving the plurality of dogs, the holes having a depth profile and the dogs having a flitch engaging portion configured to generally conform to the depth profile, the flitch-engaging portion including a plurality of flitch-engaging surfaces, positioning the plurality of dogs in the plurality of holes, and engaging the flitch with at least one of the plurality of flitch-engaging surfaces on each of the plurality of dogs to retain the flitch on the staylog with a veneer-producing zone maintained in parallel relation to a veneer-slicing knife. | • Flitch<br><br>• Dogs<br><br>• Engaging<br><br>• Veneer-producing zone |
| '995 | 12. A method of preparing a flitch for retention on a staylog and of slicing veneer from its outer surface, the flitch including a veneer-producing zone and a staylog-engaging zone, the method comprising the steps of: positioning the flitch, and forming a plurality of holes in a predetermined pattern extending through the staylog-engaging zone into the flitch, said holes being formed so as to permit engagement and retention of the flitch by the staylog in a position for removal of veneer at substantially the entire length of the outermost surface of the veneer-producing zone.<br><br>13. The method of claim 12 wherein the forming step includes the step of forming the plurality of holes simultaneously.<br><br>16. The method of claim 13 wherein the forming step includes the step of forming at least one dado hole that extends through the staylog-engaging zone to the veneer-producing zone. | • Flitch<br><br>• Staylog-engaging zone<br><br>• Engagement<br><br>• Predetermined pattern<br><br>• Forming a plurality of holes simultaneously<br><br>• Dado hole<br><br>• Forming at least one dado hole |
| '619 | 30. A method of slicing veneer from a tapered flitch so as to minimize the amount of waste veneer taken from a veneer- | • (Tapered) flitch |

---

[3] To the extent that the parties argue that the other side has waived claim construction and thus construction either by default or by the fact finder should occur, [*see* dkt. 213 at 2; dkt. 217 at 16], the Court rejects the parties' argument. As they appropriately acknowledged at the hearing, the Court has discretion to find waiver of claim construction. *Cf. Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." (citation omitted)). Ignoring objections to proposed interpretations of claim terms would needlessly frustrate the Court's ability to satisfy its independent duty to properly instruct the jury, when the time comes.

| Patent | Claims for Construction | Disputed Phrases |
|---|---|---|
| | producing zone, the method comprising the steps of: preparing a tapered flitch to include a semi-cylindrical veneer-producing zone extending along the length of the flitch; mounting the flitch to orient the semi-cylindrical veneer-producing zone parallel to a veneer-slicing knife; and rotating the semi-cylindrical veneer-producing zone past the veneer-slicing knife so as to slice veneer from the veneer-producing zone.<br><br>31. The method of claim 30 further including the step of retaining the flitch on a staylog so as to maintain the veneer-producing zone substantially parallel to the veneer slicing knife.<br><br>32. A method for cutting veneer from a tapered flitch comprising the steps of: mounting a tapered flitch on a staylog in a veneer-slicing position with its outer periphery substantially parallel to a veneer-slicing knife to create a veneer-producing zone in the flitch lying parallel to a veneer-slicing knife, the veneer-producing zone including a semi-cylindrical zone extending radially inwardly from the periphery of the flitch; and rotating the staylog to move the flitch past the knife to slice veneer from the flitch. | • Veneer-producing zone |
| '938 | 1. An apparatus for retaining a flitch, said flitch including a veneer-producing surface and a mounting surface having a plurality of cavities at predetermined positions in the flitch mounting surface, the apparatus comprising: a staylog, and a plurality of dogs coupled to the staylog for retaining the flitch on the staylog, the dogs being located at positions corresponding to the plurality of cavities in the flitch mounting surface and being formed to include a flitch-engaging portion configured to engage at least a portion of the corresponding cavities and to position veneer-producing surface for cutting.<br><br>5. A method of retaining a flitch on a staylog for slicing veneer from a tapered veneer-producing zone, the staylog having a plurality of dogs, the method comprising the steps of: providing a flitch having a plurality of holes for receiving the plurality of dogs, the holes having a depth profile and the dogs having a flitch engaging portion configured to generally conform to the depth profile, the flitch-engaging portion including a plurality of flitch-engaging surfaces, positioning the plurality of dogs in the plurality of holes, and engaging the flitch with at least one of the plurality of flitch-engaging surfaces on each of the plurality of dogs to retain the flitch on the staylog with the tapered veneer-producing zone maintained in parallel relation to a veneer-slicing knife.<br><br>33. A method for retaining and cutting veneer from a flitch with | • (Tapered) flitch<br><br>• Dogs<br><br>• Predetermined position<br><br>• Cavities<br><br>• Veneer-producing zone<br><br>• Engage / engaging |

| Patent | Claims for Construction | Disputed Phrases |
|--------|------------------------|------------------|
| | a tapered outer surface with a knife, comprising providing a staylog with a plurality of flitch-engaging surfaces extending from said staylog a distance sufficient to hold the flitch with its tapered outer surface substantially parallel to the knife; providing the flitch with a plurality of surfaces located for engagement with the plurality of flitch-engaging surfaces; engaging the plurality of flitch-engaging surfaces of the staylog with the plurality of flitch surfaces with the tapered outer surface of the tapered flitch substantially parallel to the knife; moving the flitch and the knife relative to one another and cutting veneer from substantially the entire length of the tapered outer surface of the flitch. | |
| | 36. The method of claim 35 wherein the plurality of surfaces are formed at different depths in the flitch. | |
| | 37. The method of claim 36 wherein the plurality of surfaces are formed at a substantially constant distance from the tapered outer surface of the flitch. | |
| | 42. A method of slicing veneer with a knife from a rotating tapered flitch, comprising providing at least two flitch-engaging surfaces axially spaced on a staylog, said two flitch-engaging surfaces having a sufficient height so that a tapered flitch can be supported to provide an axis of rotation of a veneer producing zone parallel to the knife, placing a tapered flitch on the [sic] at least two flitch-engaging surfaces with the axis of rotation of the veneer producing zone parallel to the knife, and rotating the flitch with the [sic] at least two flitch-engaging surfaces and moving the knife and rotating flitch relative to each other to remove veneer from the veneer-producing zone of the flitch. | |
| '828 | 1. An apparatus for preparing a flitch for slicing, the flitch including a veneer-producing zone and a staylog-engaging zone, the apparatus comprising: a plurality of cavity-forming tools, said cavity-forming tools being arranged in a predetermined pattern, a flitch holder located to retain the flitch in a predetermined orientation relative to the plurality of cavity-forming tools, and an actuator for providing relative movement between the plurality of cavity-forming tools and the flitch holder. | • Flitch<br><br>• Staylog-engaging zone<br><br>• Plurality of cavity forming tools<br><br>• Cavities<br><br>• Forming simultaneously a plurality of cavities<br><br>• Outer surface<br><br>• Engagement |
| | 10. A method of preparing a flitch for retention on a staylog and of slicing veneer from its outer surface, the flitch including a veneer-producing zone and a staylog-engaging zone, the method comprising the steps of: retaining a flitch for presentation at the staylog-engaging zone to a plurality of cavity-forming tools, and forming simultaneously a plurality of cavities in the | |

| Patent | Claims for Construction | Disputed Phrases |
|---|---|---|
|  | flitch in a predetermined pattern, each cavity extending into the staylog-engaging zone.<br><br>11. The method of claim 10 further comprising this step of providing the flitch with a surface for engagement and movement of the flitch.<br><br>14. The method of claim 10 wherein the forming step includes the step of forming the plurality of cavities with shapes permitting engagement and retention of the flitch on a staylog.<br><br>15. The method of claim 14 wherein the forming step includes the step of forming at least one dado hole that extends through the staylog-engaging zone to the veneer-producing zone. | • Dado hole<br>• Forming at least one dado hole |
| '843 | 6. A method for retaining a tapered flitch for cutting veneer from its tapered outer surface comprising: providing a staylog with a plurality of dogs; providing the flitch with a plurality of holes positioned to receive the plurality of dogs; providing relative motion between the plurality of dogs and the plurality of holes; and engaging the plurality of dogs with the flitch to retain the flitch in the staylog for cutting.<br><br>7. The method of claim 6 wherein the plurality of dogs have projecting surfaces and their relative movement with respect to the flitch engages the flitch. | • Tapered flitch<br>• Dogs<br>• Engaging |

### D. Problems the Patents-in-Suit Attempt to Solve

Capital Machine has characterized, [dkt. 237], the problems that each of the disputed claims in the patents-in-suit attempt to solve:

| Patent | Claim | Capital Machine's View on the Problem to Be Solved |
|---|---|---|
| '137 | 23 | Tapering problem |
| '995 | 12, 13, 16 | Tapering problem and the flexing problem |
| '619 | 30, 31, 32 | Tapering problem |
| '938 | 1 | Flexing problem |
| '938 | 5, 33, 36, 37, 42 | Tapering problem |
| '828 | 1, 10, 11, 14, 15 | Flexing problem |
| '843 | 6, 7 | Tapering problem |

Miller Veneers disputes that Capital Machine intended to solve the flexing problem independent of the tapering problem. [Dkt. 244.]

## CLAIM CONSTRUCTION STANDARDS

A patent holder has the right to exclude others in the United States from using, selling, or attempting to sell the patented invention. 35 U.S.C. § 154(a)(1). A patent has two chief parts:

> First, it contains a specification describing the invention 'in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same.' Second, a patent includes one or more 'claims,' which 'particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention.' …The claim defines the scope of a patent grant.

*Markman v. Westview Instruments*, 517 U.S. 370, 373-374 (1996) (quoting 35 U.S.C. § 112, but all other quotations, citations, and alterations omitted).

Claim construction presents a pure question of law, *id*. at 391, in which the Court seeks to "elaborat[e] the normally terse claim language: in order to understand and explain, but not to change, the scope of the claims," *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1580 (Fed. Cir. 1991). When the Court undertakes claim construction, it does so through the eyes of a "person of ordinary skill in the field of the invention." *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998). In this case, the parties agreed at oral argument that such a person would have a bachelor's degree in engineering or else would have five years of practical experience in the veneer industry.

Two categories of evidence exist with respect to the meaning of claim language: evidence intrinsic to the patent—"the patent itself, including the claims, the specification and, if in evidence, the prosecution history"—and evidence extrinsic to the patent, such as expert testimony. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Courts disfavor extrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en banc). Nonetheless it will have no place here; the parties exclusively cite intrinsic evidence to support their proposed claim constructions, [*see* dkt. 217, 220].

When interpreting the claim language in light of the intrinsic evidence, "there is no magic formula or catechism." *Phillips*, 415 F.3d at 1324. Several interpretative canons can, however, guide the Court's analysis.

First, a "heavy presumption" exists that "claim terms carry their full ordinary and customary meaning," a presumption rebuttable with proof that "the patentee expressly relinquished claim scope." *Epistar Corp. v. ITC*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (citation omitted). But as "his or her own lexicographer," the patentee may narrow the scope of the claim by "us[ing] terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." *Hormone Research Found. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990) (citation omitted). If terms have ordinary and customary meanings, courts may decline to provide any further construction of them. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("[A] district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." (footnote collecting cases omitted)). Alternatively, courts may simply announce those ordinary meanings. *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." (citation omitted)).

A second canon concerns the relationship between dependent and independent claims. A dependent claim "both refers to an earlier claim and further limits that referent." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1357 (Fed. Cir. 2007) (citation omitted). A presumption exists that "the presence of a dependent claim that adds a particular limitation gives rise to a pre-

sumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315 (citation omitted).

Third, although "a single claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent, the patentee's mere use of a term with an antecedent does not require that both terms have the same meaning." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (quotation omitted).

Fourth, "if an apparatus claim recites a general structure (*e.g.*, a noun) without limiting that structure to a specific subset of structures (*e.g.*, with an adjective), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted).

Fifth, "the use of different terms [in claims] implies that they have different meanings, but that implication is overcome where…the evidence indicates that the patentee used the two terms interchangeably." *Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (citations omitted).

Sixth, the language in the patent specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Because the claim language, not the specification, describes the scope of the patented invention, the specification may not, however, alter the scope of the claim: The Court must not import limitations in the specification not found in the claim language. *Phillips*, 415 F.3d at 1323. That "distinction between using the specification to interpret the meaning of a claim and importing limitations from

the specification into the claim can be a difficult one to apply in practice." *Id.* (citation omitted). To successfully navigate it, "the court's focus [must] remain[] on understanding how a person of ordinary skill in the art would understand the claim terms" in light of how they are used in the specification. *Id.*

The next set of relevant canons assist with using patent-prosecution history to help understand the true scope of the claim. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). Moreover, statements made to the Patent Office during the prosecution of a particular patent not only can help inform the interpretation of that patent and any related later patents, statements can also help inform the interpretation of previously granted related patents. *See Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) ("[E]ven though the '649 patent had already issued, we think that it is not unsound to apply the same interpretation to that patent. We take the patentee at its word and will not construe the scope of the '649 patent's claims more broadly than the patentee itself clearly envisioned." (citation omitted)). However, that maxim "does not apply when the claim term in the descendant patent uses different language." *Ventana Med. Sys. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) (citations omitted).

Finally, and in any event, the Court should attempt to glean from the prosecution history, and from the specification if necessary, "the problem the inventor was attempting to solve," to construe the terms accordingly. *CVI/Beta Ventures v. Tura LP*, 112 F.3d 1146, 1160 (Fed. Cir. 1997) (citation omitted).

As the Court uses these canons to choose among possible constructions, the Court must bear in mind that "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316.

## III.
### CONSTRUCTION OF THE CLAIMS AT ISSUE

For each of the disputed phrases in each of the patents-in-suit, the Court will first present in tabular form the competing interpretations that the parties have offered and the Court's construction, reached in light of the foregoing interpretative standards that the Federal Circuit has promulgated.[4] The Court will then address specific arguments that the parties have raised.

### A. Construction of the '137 Patent

#### 1. "Flitch"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Flitch | Half a log formed by cutting a log down the middle along its longitudinal axis and having a taper at the butt end of the log to the top of the log such that it cannot be mounted flat on a staylog with an outer surface parallel to a veneer slicing knife. [Dkt. 226 at 4.] | A portion of a log resulting from the log being cut from one end to the other. [Dkt. 220 at 17.] | *A portion of a log resulting from the log being cut along its longitudinal axis and thus having a taper at the butt end of the log.* |

[4] Miller Veneers' reply brief made changes to some of its proposed definitions to address Capital Machine's objections. To the extent that there were changes, the proposals that follow are from the reply brief. As for Capital Machine, it contends that terms at issue should be given their ordinary meanings. Its proposals reflect an attempt to express that ordinary meaning. The Court will not discuss objections that Capital Machine made that are now moot in light of Miller Veneers' changes to the proposed definition.

Although Capital Machine argues that its occasional use of the phrase "tapered flitch" elsewhere in the '137 Patent indicates that Capital Machine explicitly specified the tapering limitation when it applied, that argument is unpersuasive. [*See* dkt. 217-1 at 13, column 2 ("1. An apparatus for retaining a tapered flitch on a staylog….").] As the "background of invention" portion of the specification of the '137 Patent clearly indicates, "because the tree trunk is naturally tapered, one end of the flitch is thicker than the other end…." [Dkt. 217-1 at 10, column 1.] And all the drawings in the patent show flitches with a taper on them. Further, as Capital Machine has acknowledged elsewhere, Claim 23 of Patent '137 was designed to solve the tapering problem of making veneers from tree logs. [Dkt. 237.] If an untapered flitch were used, Claim 23 would provide no useful innovation. Given the claim language, the background section of the patent setting forth the ordinary meaning of the term, and the underlying purpose of the invention, a person of ordinary skill in the field of the invention would understand the flitch in Claim 23 to have a natural taper. *See Epistar*, 566 F.3d at 1334; *Phillips*, 415 F.3d at 1316. A flitch that had its taper artificially removed would constitute a special case that a person of ordinary skill in the field would expect to be specifically disclosed—as Capital Machine did when describing its invention in part of the '843 Patent specification. [Dkt. 217-6 at 21, column 10 ("Untapered flitches can also be sliced in the reciprocating flitch table **210**. Generally, the taper is removed from the flitch at the sawmill by squaring the log prior to cutting the log in half to form a pair of untapered flitches.").]

Capital Machine has, however, correctly objected to Miller Veneers' attempt to define a flitch by explicit reference to its ability to be mounted parallel to a veneer slicing knife. A flitch becomes a flitch when it is cut, not when it is mounted on the staylog. While a natural taper may well preclude parallel mounting in practice, reading a mounting limitation from the specification

into the claim would impermissibly change the scope of the claim, rather than merely explain it.

*See Genentech*, 927 F.2d at 1580.

### 2. "Dogs"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|---|---|---|---|
| Dogs | Mechanical devices having a plurality of annular knife edges axially spaced apart along the longitudinal axis of the device and having a shape that does not change, the device being used to hold the tapered flitch on the veneer slicer. [Dkt. 217 at 37.] | Devices that apply force to an object to grip or retain the object. [Dkt. 220 at 29.] | *Devices without movable parts that apply force to grip or retain a flitch on the veneer slicer.* |

With respect to the proposed limitation of "annular knife edges," Miller Veneers originally argued that Capital Machine had expressly told the Patent Office during patent prosecution that annular knife edges would be required for Claim 23. [*See* dkt. 217 at 38.] In subsequent briefing, however, Miller Veneers conceded that that express requirement was actually for Claim 22, which is not at issue here. [*See* dkt. 246 at n.3; *see also* dkt. 217-1 at 14, column 10 ("22 A dog for retaining a flitch for cutting, comprising…a second portion having a plurality of annular knife edges for engaging the flitch, the knife edges being axially spaced-apart along a longitudinal axis of the dog.").]

Having made that concession, Miller Veneers also implicitly concedes that Capital Machine has identified several canons of construction that preclude applying the annular-knife-edge limitation. [*See* dkt. 226 at 16 ("[A]ny presumption associated with [the canons Capital Machine has identified and which Miller Veneers does not otherwise dispute] may be overcome, when, as here, the patentee has limited the scope of his invention during prosecution.").] Appropriately

- 14 -

so:  Among other things, the doctrine of claim differentiation precludes that limitation; Claim 1 references dog and dependent Claim 2 adds the limitation of "annular knife edges" to dogs.  [Dkt. 217-1 at 13-14, columns 8-9.]  And indeed the specification discloses that "[i]t is understood that the knife edges can be modified to include non-annular knife edges without departing from the scope of the invention."  [Dkt. 217-1 at 12, column 6.]  Accordingly, the Court rejects Miller Veneers' attempt to define all dogs in the patent as necessarily having annular knife edges.  If Claim 23 were limited to dogs with annular knife edges, the Claim would have said so, as Claim 2 did.

As for Miller Veneers' proposed "that-does-not-change" limitation—in other words, as Miller Veneers clarified at oral argument, having "no movable parts"—Miller Veneers has argued that the '137 Patent presents "embodiments [that] clearly have a shape that does not change and there is no description anywhere…that shows a dog having a shape that can change."  [Dkt. 226 at 17.]  At oral argument, Capital Machine was unable to locate any language that contemplated a dog with moveable parts.  The Court has been unable to locate any such language either; therefore, the Court will include the limitation because a person of ordinary skill in the art would not understand a dog as referenced in the '137 to have movable parts.[5]

In construing "dogs," the Court also notes that it has not included the adjective "tapered" before "flitch," as Miller Veneers' proposal did.  Because flitches are naturally tapered, and because this patent makes no attempt to indicate an artificially "untapered" flitch, no need exists to include the otherwise redundant phrase "tapered flitch."  As for the reference to holding the flitch on the veneer slicer, Capital Machine expressed no objection to that portion of the definition.

---

[5] Even though the dog does not have movable parts, it is not necessarily stationary. At oral argument, Capital Machine argued, and Miller Veneers did not dispute, that "pusher pin" dogs move.  [*See also* dkt. 217-1 at 12, column 2.]

### 3. "Engaging"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Engaging | Movement of the tapered flitch into the knife edges of the stationary dogs so as to secure the tapered flitch on the staylog. [Dkt. 217 at 36.] | Causing to touch. [Dkt. 220 at 25.] | *Causing to touch.* |

In its response brief, Capital Machine identified several reasons why Miller Veneers' proposal conflicted with Federal Circuit authority. [*See* dkt. 220 at 26-29.] Miller Veneers neither responded to those arguments in its reply, [*see* dkt. 226], nor at oral argument. The Court interprets Capital Machine's silence as an indication of the force of those arguments, which the Court has reviewed and independently found convincing. *Greenlaw v. United States*, 554 U.S. 237, 243-44 (2008) ("[O]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief." (quotation omitted)).

### 4. "Veneer-Producing Zone"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Veneer-producing zone | The portion of the tapered flitch parallel to the veneer-slicing knife, which includes a taper, and which has no holes, and from which veneer is cut, as distinct from the staylog-engaging zone. [Dkt. 226 at 14]. | The part of the flitch from which veneer may be cut. [Dkt. 220 at 21.] | *The portion of the flitch parallel to the veneer-slicing knife and from which veneer is cut, as distinct from the staylog-engaging zone.* |

In construing veneer-producing zone, the Court agrees with Capital Machine that it is inappropriate to include references to tapering here. [*See* dkt. 220 at 22.] While Capital Machine

argues that no tapering limitation is present at all in this Claim, the Court has, for reasons expressed above, already found that Capital Machine defined flitches for the purpose of Claim 23 to have a natural taper. Given the tapering limitation already present in the term flitch, adding additional tapering references would be redundant, so the Court has excised them.

The Court has also found that Capital Machine appropriately objected to Miller Veneers' use of the "no holes" limitation. Miller Veneers added that limitation on the basis of Figures 2 and 4 of the specification. [*See* dkt. 226 at 15 n.15.] But Miller Veneers is unable to tie the limitation into any language in the claim or the specification. Given that the presence of holes on the flitch, either natural or otherwise, would not impede the essential problem that the patent addresses—namely, accounting for the natural taper in the flitches—the Court finds that a person of ordinary skill in the art would not understand "veneer-producing zone" to necessarily be without holes. The Court will not, therefore, include that limitation. *Phillips*, 415 F.3d at 1323.

The Court has, however, overruled Capital Machine's objection to the qualification "as distinct from the "staylog-engaging zone." Because the patent specification makes clear that veneer should be cut from the outside portion of the flitch, a person of ordinary skill in the art would understand the veneer-producing zone to refer to that part of the flitch. Furthermore, as Miller Veneers appropriately notes, if the veneer-producing zone overlapped with the staylog-engaging zone, pin dogs would extend into the veneer-producing zone, causing waste of veneer that this invention was designed to avoid.

### B.  Construction of the '995 Patent

#### 1.  Terms that Duplicate the '137 Patent

The claims at issue in the '995 patent also refer to "flitches." They also refer to "engaging" or the variant "engagement," phrases that the parties agree are essentially synonymous.

[Dkt. 220 at 26.] In their briefing, the parties have treated the construction of those terms together, rather than seriatim in each of the patents-in-suit. Having carefully considered the language in the '995 Patent, and the tapering problem that Capital Machine indicated it attempted to solve, the Court finds no reason to construe "flitches" and "engaging" and "engagement" any differently in this patent than in the '137. The same constructions will, therefore, also control here.

### 2. "Staylog-Engaging Zone"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|---|---|---|---|
| Staylog-engaging zone | The portion of the tapered flitch that includes holes of varying depths, as distinct from the veneer producing zone. [Dkt. 226 at 15.] | A part of a flitch to which a staylog may be attached. [Dkt. 220 at 23.] | *The portion of the flitch that includes holes of varying depths, as distinct from the veneer-producing zone.* |

Capital Machine's objection to the inclusion of "holes of varying depths" stems from its incorrect view that the flitch for '995 need not be tapered. [*See* dkt. 20 at 24.] The Court has already rejected that view for the reasons previously stated. Additionally, the Court has accepted the phrase "as distinct from the veneer-producing zone" for the same reasons as the phrase "as distinct from the staylog-engaging zone" was accepted in Section (III)(A)(4) above.

As it has done previously, the Court has omitted the adjective "tapered" before the flitch. Because flitches are naturally tapered, including the adjective is redundant.

### 3. "Predetermined Pattern"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|---|---|---|---|
| Predetermined pattern | Forming a pattern of holes of various depths in the staylog-engaging zone to account for the taper. [Dkt. 226 at 18.] | A pattern determined in advance. [Dkt. 220 at 33.] | *A pattern of varying depths that is determined in advance.* |

Once again, Capital Machine's primary objection to Miller Veneers' proposed definition stems from its claim that the flitch in the '995 Patent need not have its natural taper. [*See* dkt. 220 at 34.] While Capital Machine contends that the '995 Patent seeks to solve the flexing problem, which would not depend on the natural taper of the flitch, it also claims that the patent seeks to solve the tapering problem. [Dkt. 237 at 2.] Thus the specification indicates that the "primary factors in determining" the hole depth "is maximizing the depth of the veneer-producing zone…while affording maximum surface contact between the pusher pins…and the pusher pin-receiving holes…as well as maximum engaging contact between the pin dogs…and the flitch…." [Dkt. 217-2 , column 7.] A need to maximize the depth of the veneer-producing zone only exists because of the natural taper of the flitch, which necessitates holes of varying depths depending upon their location along the flitch.[6] The Court will include the reference to those varying depths to account for the specification that Capital Machine has provided. *See Vitronics*, 90 F.3d at 1582.

The Court has selected Capital Machine's proposed definition as the starting off point for the Court's construction because Miller Veneers' definition, when read in the context of the words of Claim 12, is linguistically awkward and contains redundant terms. The Court has, however, incorporated the "of varying depths" language from Miller Veneers, for the reasons set forth above. The Court has omitted the word "holes" from Miller Veneers' proposal, to avoid redundancy of the "holes" already present in the phrase "forming a plurality of holes in a predetermined pattern."

---

[6] In the portion of Capital Machine's brief devoted to "predetermined pattern," Capital Machine cites to language in the other patents-in-suit, but not the '995 Patent. [*See* dkt. 220 at 35.]

### 4. "Forming a Plurality of Holes Simultaneously"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Forming a Plurality of Holes Simultaneously | Forming all of the holes or cavities at the same time. [Dkt. 217 at 48.] | Forming more than one hole at the same time. [Dkt. 220 at 39.] | *Forming more than one hole at the same time.* |

With respect to the phrase "forming a plurality of holes simultaneously," the controversy—expressed in very short briefing—concerns whether all holes must be formed at once, or simply whether multiple holes must be formed at a time. The Court has found the latter.

In arguing for a requirement that all holes or cavities be formed at the same time, Miller Veneers argues that "nothing in the specification" precludes such a definition. [Dkt. 217 at 48.] The relevant issue, of course, is not what the specification precludes, but what the claims—interpreted as necessary with resort to the specification—affirmatively include. The parties agree that the ordinary meaning of plurality is "more than one" and that simultaneously means "at the same time." [*Compare* dkt. 217 at 48, *with* dkt. 220 at 39.] Putting the discrete phrases together, as a person of ordinary skill in the art would, means forming more than one hole at the same time, which is exactly the construction the Court has adopted.

### 5. "Dado Hole"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Dado hole | A hole having a generally rectangular opening and a generally circular depth profile, made by a dado saw blade, for example, which receives dogs. [Dkt. 17 at 48.] | (No proposal offered.) | *A hole having a generally rectangular opening and a generally circular depth profile, made by a dado saw blade, for example, which receives dogs.* |

Although Miller Veneers offered a definition of "dado hole" in its opening brief, Capital Machine failed to address it in response, [*see* dkt. 220], at oral argument, or in surreply, [*see* dkt. 245]. Having reviewed Miller Veneers' arguments, the Court finds them persuasive, especially in the absence of any substantive objection from Capital Machine.[7] [*See, e.g.*, dkt. 217-2 at 13, column 8 ("The dado holes…have a generally rectangular opening…at the flitch mounting surface…and a generally circular depth profile….").]

### 6. "Forming at Least One Dado Hole"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|---|---|---|---|
| Forming at least one dado hole | In addition to the plurality of cavities formed, at least one dado hole is formed. [Dkt. 226 at 19.] | The plurality of cavities or holes formed includes at least one dado hole. [Dkt. 220 at 40.] | *The plurality of holes formed includes at least one dado hole.* |

At issue with respect to the phrase "forming at least one dado hole" is whether the plurality of cavities formed are exclusive or inclusive of at least one dado hole. The Court finds that the latter is correct.

In arguing in support of its proposed definition, Miller Veneers—which did not undertake a patent-by-patent analysis of each phrase, but instead treated them together—focused its arguments exclusively on interpreting the phrase in the context of the '828 Patent. [*See* dkt. 217 at 46.] Other than noting that the phrase was included in the '995 Patent, Miller Veneers made no mention of it. The concerns it raised are not present in the '995 Patent, which does not use the

---

[7] At oral argument, Capital Machine suggested that Miller Veneers had waived its right to ask for construction of this claim as not previously disclosed, despite it being discussed in Miller Veneers' briefing and being selected for oral argument as part of the joint agenda that the parties prepared, [*see* dkt. 235 at 3]. As indicated previously, *see supra n. 3*, the Court finds it prudent here to focus on substance, not procedure. To whatever extent a waiver may have technically occurred, the Court excuses it.

phrase "cavities" in the claims at issue and thus does not potentially differentiate between "cavities" and "holes." Additionally, as Capital Machine correctly points out, Figure 9b of the patent discloses an embodiment involving only dado holes.  [*See* dkt. 217-2 at 7.]  Miller Veneers' proposed construction would impermissibly foreclose that embodiment.  Accordingly, the Court has rejected Miller Veneers' proposed definition for the purposes of this patent.

The Court has modified Capital Machine's definition to avoid any mention of "cavities." As indicated above, '995 Patent does not use the word "cavities." No need exists to inject that new term here.

## C.  Construction of the '619 Patent

The only two terms at issue in the '619 Patent—flitch and veneer-producing zone— duplicate terms found in either the '137 Patent, the '995 Patent, or both.  Especially given that the '137 Patent and '995 Patent are the "parent" patents of the '619 Patent, and given that the parties themselves have treated the phrases at issue in the patents-in-suit as having the same meaning in each patent, the Court finds no basis to ascribe different meanings here.  *See Elkay*, 192 F.3d at 980 ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." (citation omitted)).  With respect to the term "flitch" in particular, the Court notes that Capital Machine expressly concedes that "[t]his is a patent in which each claim already requires a 'tapered' flitch,'" and that the Patent Office was told so during patent prosecution.  [Dkt. 220 at 19.]

### D. Construction of the '938 Patent

#### 1. Terms Included in the '137 and the '995 Patents

The '938 Patent uses terms previously discussed in the context of the '137 Patent, the '995 Patent, or both.[8] After considering the parties' arguments and the actual language used in the '938 Patent, the Court finds no basis to interpret the following terms any differently than the Court interpreted them above:

- **"Flitch."** Beyond the reasons previously cited, the Court notes that several claims in the '938 Patent were, by Capital Machine's own admission, addressed to the tapering problem. Absent an express indication that the natural taper of the flitch had been removed—for example, a reference, not present, to an "untapered flitch,"—an ordinary person of skill in the art would understand the flitches described in the patent to have a taper. [*See also* dkt. 217-4 at 2 (abstract of '938 Patent beginning "[t]he present invention includes an apparatus for retaining a tapered flitch….The flitch is held on the staylog….").] It is obvious that flitch and tapered flitch were used interchangeably throughout the patent. Additionally, Capital Machine overcame an objection to patentability from the U.S. Patent Office by arguing that the '938 used tapered flitches. [*See* dkt. 217-10 at 4 ("Nothing in Weil '874 discloses or suggests use of a tapered flitch….").]

- **"Engage" / "engaging."** The parties agree that "engage" and "engaging" have the same meaning. [Dkt. 217 at 34; dkt. 220 at 26.]

- **"Dogs."** Like the '137 Patent, this patent's specification expressly indicates that "knife edges can be modified to include non-annular knife edges without departing

---

[8] Several terms also duplicate the "sibling" '619 Patent.

from the scope of the invention." [Dkt. 217-4 at 12, column 6.] Although the patent indicates "moveable dogs," [*id.* at 2], the patent contains no indication that the dogs themselves contain movable parts.

- **"Veneer-producing zone."** The Court notes that Miller Veneers has dropped its request to construe additional terms that it contended were "largely equivalent" to veneer-producing zone. [Dkt. 226 at 14.]

- **"Predetermined position."** The parties agree that "predetermined pattern" and "predetermined position" have the same meaning. [Dkt. 220 at 33; dkt. 226 at 18.]

### 2. "Cavities"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Cavities | Holes, but not dado holes. [Dkt. 217 at 43.] | Spaces or holes. [Dkt. 220 at 36.] | *Holes.* |

The Court rejects Miller Veneers' argument that cavities cannot include dado holes. Miller Veneers notes that the '828 Patent uses "cavities" in one claim and then "dado hole" in a dependent claim. [*See* dkt. 217 at 46.] Miller Veneers argues that the difference must have some meaning, hence its proposed definition. [*See id.*] That argument does not work, however, with respect to the '938 Patent; the dependent and independent claims here do not alternate between mentioning "cavities" and "dado holes." [*See* dkt. 217-4 at 14-15, columns 10-11.] Furthermore Miller Veneers' argument that cavities and holes have different meanings conflicts with Miller Veneers' proposed definition of "predetermined position"—which the Court has essentially adopted. That proposed definition treats holes and cavities as synonyms. [*See* dkt. 226 at 18 ("The phrase… 'predetermined position,' when used in connection with forming 'holes' or 'cavi-

ties' means:  'Forming a pattern of holes of varying depths in the staylog engaging zone to account for the taper" (emphasis omitted)).]

The Court has omitted "spaces" from the construction.  Although Capital Machine offered the term, it provided no justification to include the term, which only potentially complicates the definition.

### E.  Construction of the '828 Patent

#### 1.  Terms  Included in the Previous Patents

The Claims at issue in the '828 Patent use several terms that the Court has already construed in the context of the patents above and which, for substantially the same reasons offered previously, should receive the same construction here, in light of the language in the '828 Patent:

- **"Flitch."**  Although Capital Machine asserts that this patent seeks to resolve only the flexing problem, the pedigree of the patent, the "naturally tapered" language in the specification, and the fact that all the flitches pictured are tapered, all convince the Court that "flitch" for the purposes of the '828 Patent includes a taper.

- **"Veneer-producing zone."**  The Court notes that Miller Veneers dropped its request to construe outer surface, which it contended was largely equivalent to veneer-producing zone.  [Dkt. 226 at 14.]

- **"Staylog-engaging zone."**

- **"Cavities."**  As indicated above, Miller Veneers has argued that because dependent Claim 15 uses the word "dado hole" which independent Claim 10 speaks of "cavities," [*see* dkt. 217-5 at 14-15, columns 10-11], "cavities" and "dado hole" must have completely different meanings.  As Capital Machine appropriately points out, however, a dado hole is a type of cavity; therefore, the claim differentiation canon does not

require "cavities" to necessarily exclude "dado holes," as Miller Veneers requests. [*See* dkt. 220 at 37.] The Court notes that Miller Veneers was unable to respond to that argument on reply. [*See* dkt. 226 at 19-20.]

- **"A plurality of cavity-forming tools."**

- **Forming simultaneously a plurality of cavities.**

- **"Engagement."** The parties agree that "engage,""engaging," and "engagement" have the same meaning. [Dkt. 217 at 34; dkt. 220 at 26.]

- **"Dado hole."**

- **"Forming at least one dado hole."**

2. **"Plurality of Cavity Forming Tools"**

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|------|--------------------------|----------------------------|----------------------|
| Plurality of cavity forming tools | Tools for drilling holes in the staylog engaging zone, excluding a dado saw. [Dkt. 226 at 19] | More than one tool for forming a hole or cavity, including dado saws. [Dkt. 220 at 37.] | *More than one tool for forming a hole or cavity, including dado saws.* |

The parties dispute what "plurality of cavity forming tools" means, chiefly whether the tools include or exclude dado saws.

Given that the Court has already found that "cavities" includes "dado holes," Miller Veneers' arguments here fall away. As it argued at the hearing, "[l]ogically, if 'cavities' do not include 'dado holes,' then the 'plurality of cavity forming tools' does not include a dado saw." [Miller Veneers' PowerPoint Presentation, "Cavities and Plurality of Cavity Forming Tools," at 5.]

Miller Veneers' arguments also fall away because Figure 9a in the '828 Patent shows a plurality of dado saw blades capable of simultaneously forming a plurality of cavities. [Dkt.

217-5 at 7.] Thus a person of ordinary skill in the art would understand the phrase to include cavities made by dado saws. *See Phillips*, 415 F.3d at 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case."). To the extent that Miller Veneers argues that—notwithstanding the illustration—dado saws must be excluded or else the patent would be invalid, the Court rejects that line of argument. The Court must determine what a patent claims, before it can determine whether the claims are in fact invalid. *See Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379 n.1 (Fed. Cir. 2008) ("Apotex asserts that, if the '493 claims are construed to cover the entire claimed O[40] concentration range, then the claims are invalid under 35 U.S.C. § 112…. Such arguments go to the validity of the claims of the '493 patent."); *Akamai Techs. v. Cable & Wireless Internet Servs.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) ("The first step in any invalidity analysis is claim construction…." (citation omitted)). To the extent that Miller Veneers argues that the text accompanying the figure only speaks of a single dado blade, the Court still rejects the argument because the text makes clear that the explanation is "illustrative[]" only, [dkt. 217-5 at 13, column 8]—not the sole embodiment of the invention contemplated. *Phillips*, 415 F.3d at 1323 (explaining that descriptions can either be illustrative of the claims or co-extensive with them).[9]

### 3. "Forming Simultaneously a Plurality of Cavities"

| Term | Miller Veneers' Proposal | Capital Machine's Proposal | Court's Construction |
|---|---|---|---|
| Forming simultaneously a plurality of cavities | Forming all of the holes or cavities at the same time. [Dkt. 217 at 48.] | Forming more than one cavity at the same time. [Dkt. 220 at 39.] | *Forming more than one cavity at the same time.* |

---

[9] Miller Veneers does not appear to contest that the figure actually, or could reasonably be interpreted, as showing more than one dado saw.

The parties dispute "forming simultaneously a plurality of cavities." The Court has selected its construction of the phrase for substantially the same reasons as the Court offered previously, with respect to "forming a plurality of holes simultaneously," above.

### F.  Construction of the '843 Patent

Both claims at issue in the last of the Patents-in-Suit replicate terms from previous patents: "tapered flitches," "dogs," "holes," and "engaging."[10] As with the previous patents, the language of the '843, the fact that '843 Patent descends from other patents using the same language, and this Patent's intention to solve the tapering problem demonstrate to the Court that those terms should have the same meanings here that they did in the other patents. With respect to the natural tapering of flitches in particular, the Court notes that the '843 Patent summarizes its invention as "an apparatus for retaining a tapered flitch." [Dkt. 217-6 at 17.]

## IV.
### CONCLUSION

The definitions set forth above will control the interpretation of the Patents-in-Suit going forward. Capital Machine's Motion Regarding Defendants' Waiver of *Markman*/Claim Construction Issues, [dkt. 213], is **DENIED** to the extent that it seeks to waive claim construction but **GRANTED** to whatever extent the Court has accepted Capital Machine's constructions of disputed terms.

The Court requests that Magistrate Judge Lynch assist the parties in the development of a Phase II Uniform Patent Case Management Plan at her earliest convenience.

---

[10] Miller Veneers dropped its request for construction of "tapered outer surface." [Dkt. 226 at 14.]

09/14/2011

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Cynthia A. Bedrick
MCNEELY STEPHENSON THOPY & HARROLD
cabedrick@msth.com

Jennifer M. Frasier
MCNEELY STEPHENSON THOPY & HARROLD
jmfrasier@msth.com

J. Lee McNeely
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com

Paul B. Overhauser
OVERHAUSER LAW OFFICES, LLC
poverhauser@overhauser.com

Brady J. Rife
MCNEELY STEPHENSON THOPY & HARROLD
bjrife@msth.com

Michael A. Swift
MAGINOT MOORE & BECK LLP
maswift@maginot.com